May it please the Court, my name is Robert Oakley. I'm here from the Department of Justice representing the government in this fees case. This is a case where the district court awarded Plaintiff's Counsel, under the Endangered Species Act, citizen supervision $1.8 million in fees. What's our standard of review? Your standard of review is abuse of discretion. Okay, that's a pretty high hurdle. It is, but you have to have, you have to see that the district court, in fact, shows you it exercised some discretion. In the Dugmasian v. Gates case that we cite in our brief, there's an example of a judge, actually the same judge, who said, well, I'm taking off 10 percent. And the Court reversed because it said, look, you have to give us at least some explanation. You don't have to go line by line. You don't have to refute every single objection made to the party objecting to fees. But you have to give us some, you have to show some of your work. So what did Judge Carlson fail to do here? Well, he didn't even show, just on his calculations, I had to spend a lot of effort to make assumptions and guesses to tell you how he came out to his calculations. And even then he had an error of math in the calculations, although I'll say it's an error that benefits my client. I'll say it benefits my client by $1,000. But you'll see, if you look at, I think it's footnote 4 on page 23, you'll see what I had to do and you'll see that I'm making assumptions. He gave three reasons for the across-the-board 20 percent haircut. One was an overall statement that the 58 percent. Well, we've described 10 percent as the haircuts. 20 percent would be twice the haircut. Yes. That would be a good buzz. That would be a good buzz. The other reason was it could be an excessive buzz depending on the facts. The facts of this case, there was a, I think, a 47-page biological opinion. I suppose, Your Honor, Judge Bybee, to the San Luis case where you wrote the majority opinion, where you were looking at, and I'm just talking about the biological opinion, was over 400 pages. It cost me a lot of time in my life. And I spent a lot of my time, too, on that thing and the petitions or our responses to the petitions we're hearing on Bonk or due Monday. Well, let me just cut to the chase here. The court gave quite a few reasons for its determination that 20 percent was an appropriate reduction. It talked about the unreasonableness of some of the plaintiff's billing entries. For example, travel at full time. It said some of the entries were for clerical work. It said sometimes they had too many attorneys in a conference. It said that they hadn't adjusted for the differential experience of various lawyers. Those are very specific comments. It's not as if the court just said, oh, well, gee, I think I like the number 20. I mean, there's quite a bit of explanation. Why isn't that sufficient? There are six pages of analysis here for a very large fee award in a case where it's hard to understand how anybody's So abusive discretion is not writing enough pages? No, of course not. We – there are a number of things, for example, that the court said it was going to do, cut travel time by half. It never mentions that. It does not mention that. It gives three reasons for the 20 percent. It's all part of the 20 percent. Those things that I listed as I read it are all go into the determination that that 20 percent cut is appropriate, and that's a pretty significant cut. The court is – Judge Greber, you are reading into – I have to say with due respect, you're reading into things, into the 20 percent cut, things that the judge just did say. He gave three reasons, three. The 5,800 hours in general were too big. The time spent by multiple attorneys on calls and meetings were too many hours. And then finally, that they had used the wrong rates in terms of the experience of the attorneys. So those are the only three reasons. He then, you might say, amended it after the fact. In the first decision, he says FOIA costs are not covered because they've been settled. We filed a motion for reconsideration because there was evidence of they were seeking money for FOIA attorneys' fees, which had been covered by the FOIA settlement. He – his response is to say in the motion for reconsideration, well, I covered that by the 20 percent. But that wasn't what he said in the original decision. He's rewriting his decision after the fact. So now we have four. The other items he discusses and he says, well, I'll take off 50 percent. But he doesn't say, and I'm taking care of that with the 20 percent overall cut. He leaves – he says, I can't – I think there's some merit to the clerical objections, but I can't figure out how much in this 27-page document. He doesn't say that's covered by the 20 percent. If he had said so, if he had tied all of this more closely to the 20 percent, he would be on better grounds. Also, if he'd shown his work on the math and he explained, because some of the confusion – I will give this certainly to the district court – was that the plaintiffs kept filing more and more paper. We would spot problems and they would find costs which, gosh, they forgot to put in their original demand. So they would refile. We would make more objections. They would refile. This is why, if your clerks have had to look at the hard copy of the excerpts of record, they will be astonished, because it's like ten volumes, because it's just refiling and refiling and refiling. So there's a ton of paper in this case. Kagan. But what is the strongest objection that you made that you claim the district court didn't take into account? I think the FOIA objection – I mean, these are in terms of specific objections. I think the FOIA objection is the strongest because he first says, I don't have to worry about it because it's been settled. And then we say to him, oh, they're still seeking FOIA claims. And he said, oh, that was included in the 20 percent. He's contradicting himself between the two opinions. But I don't think we should lose sight of this. I didn't even know 47-page biological opinions existed anymore. I've been doing this for years. I have never seen one. There are usually hundreds and hundreds of pages. Now, counsel says, well, there's a 49,000-page administrative record. Nobody, if they read every page of the administrative record, then they did waste time. Nobody ever reads all of those things. They come on disk. They're in acrobat form. They're word-searchable. You look for the relevant parts. This is just an unusual case to generate this much money. I mean, we recognize that the standard of review is difficult on challenges to district court decisions on fees. But we just thought, and this is the taxpayer's money. And we can't say, well, you know what? It's not coming out of my salary, so I'm going to let it go. So I don't need that. Was there any effort to, you know, talking about taxpayer's money, was there any effort to come to an agreement about the appropriate amount of fees rather than your filing this appeal? Well, I don't want to violate any of the Court's rules on confidentiality. You don't need to answer that. I'm sorry. It's just there was an effort. I know there was some contact with the mediator's office. That was unsuccessful. It was unsuccessful. That's why we're here. But I just so I don't lose my big point here. It's that it's both our objections, but we tried to in the we made really sort of two sets of objections. One were time-specific. Those are the second ones. Those are the ones with the schedules where we say this is clerical work, this is FOIA work. And then there's the standing question, which is separate. And the standing question, that's another issue, because this Court has said that if the costs are caused by an intervener and not by the government, and here the government said, well, gosh, we're not challenging standing. Yes, but you requested discovery, did you not? And there's nothing – I don't think there's anything inappropriate about that. I'm not suggesting it's inappropriate. I'm suggesting that by doing so, you put it in issue as well as the interveners did. Well, no, I don't – I have to respectfully disagree. I mean, we were satisfied by the discovery. It wasn't that we were pushing the issue. They decided they wanted to knock this out of the case early. And so they affirmatively moved. This is not them responding to a motion. They affirmatively moved. And we say in our response, we don't contest standing. So that we took a deposition that we so frightened them by taking a deposition to find out the substance of the standing problem, that they're justified in hitting us for fees. I mean, I would submit it would actually – it would have been inappropriate for us. I don't know what we were supposed to do other than what we did, which was to say in response to their motion, look, we don't contest it. If they called us and asked us, if they wanted a letter, they could – you ask about mediation. They could have said, look, are you still pursuing standing? And there's nothing in their record. They didn't do that. They wanted to file their motion. They lost 11 motions. They talk about winning 15. They lost 11. This is just for this side of the case. If this is going to come to the floor, thank goodness Judge Bybee's opinion ruled for the government, so we're not going to be subject to fees in that case. But if we were subject to fees in the San Luis versus – I'm sorry, San Luis and Delta Mendoza Water Authority versus Jewell case, with a 400-page plus buyout, 15 issues on appeal, three issues on a counterclaim, and we lost all of that to someone with a valid fee claim, you take this case and multiply it by a very large number. But isn't that a problem that's better addressed to Congress? I mean, Congress has decided that we're going to have fee shifting here. And under EJ, you have a much stricter standard. And if this were an EJ case, we'd be having a very different argument here. But you've already conceded that it's an ESA case. Yes. And that's got a very – and that fees are owing. So the only question, then, is whether the district court abused its discretion. But the question of how much money, you know, is owed under ESA and whether that's too much money or whether in a different case it would run into, you know, hundreds of millions of dollars in fees, those are questions that are probably better addressed to Congress. To a certain extent. But the district court has to be entitled to abuse of discretion, standard of review by this panel. It has to actually show that it exercised some discretion. It cannot, in the words of the panel who wrote the Gates v. Duke Magian case, throw off its hands and apply a haircut. That's not appropriate. That's not the law of the circuit. And our position is simply in the six pages that the judge wrote on the main fees decision. He ignores too much. He doesn't explain what goes under the 20. I mean, we're making assumptions as to what's going under the 20 percent and what's not. He only names three things there. He may try to retroactively post hoc expand it to four in his ruling on emotion reconsideration. He made mistakes in the math. He didn't explain the math. I think at least a judge should say, okay, 20 – I mean, because it sounds pretty simple, doesn't it? 20 percent deduction, but look at my footnote, four, in our opening brief. And you'll see I had to make some real assumptions here. Did you wish to save some rebuttal time? I did, and I see I'm down to three minutes and 30 seconds, so I'll stop now then. Thank you. Okay. Mr. Spruill. Christopher Sprouill for the appellees. Sorry, I mispronounced it. May it please the Court. The first thing I wanted to start out with is on a math point, it's not nearly as complicated as my esteemed colleague would have. If you simply take the total amount that was awarded, multiply it by 20 percent, you get the number that's in Judge Carleton's order. He's off by $1,000. It looks like a simple typographical error that $1,000 was in their favor. I would like you to address the question about the standing issue and to what extent the government should be responsible for the fees incurred in the standing matter. Yes, Your Honor. If there ever was, however, an instance of the tail wagging the dog, this is it. It's a chemical trace of the overall dollar amount involved in the fee application, .1. But furthermore, the government's representations of the standing episode is really quite at odds with the facts, as I think a review of the record will reveal. As you pointed out, Your Honor, they did serve discovery on us. We responded. The Federal Government clearly indicated to us that they viewed our discovery responses as inadequate. At that point, rather than continue, they suggested we think you need to do more. Rather than continue to take the considerable additional time to respond to this discovery, we thought, look, we think what we've got is enough. Let's just bring a motion. We have to satisfy YCWA anyway, number one. And number two, we have to satisfy the court. I mean, even if they had agreed, okay, you have standing, it would be malpractice for us not to have gotten evidence in the record of our standing. The court's cases make plain that it's jurisdictional, subject matter jurisdictional, and it's a case that would be reasonable, raisable at any time, sua sponte. How much was awarded for contesting or litigating standing? I don't have the exact figure. But it's a few thousand dollars. It's a very small amount compared to the $1.8 million. Could you just explain to me kind of large overview, what was sought in the litigation and what was obtained? Yes. We got excellent results in this case, as Judge Carlton appropriately found. Yes, I understand. Yes. We had three main objectives, and we accomplished all of them. The first was we thought that the 37-page biological opinion that my esteemed colleague keeps referring to, we held that it was arbitrary and capricious. I mean, we tend to agree that any biological opinion that short is suspect, and it was. And Judge Carlton found it. It was replaced, my colleague overlooks this, it was replaced by a 300-page biological opinion. This was a very complicated situation. And so that first and foremost, we had an arbitrary and capricious biological opinion that provided inadequate protection for three listed species. We had that held arbitrary and capricious. Yes. Now, what is it that the government was doing that threatened these species? They maintained two dams on the Yuba River that blocked passage of three species of endangered anadromous fish. They also authorized water districts to divert water, operate water diversions in this area, and those also are harmful to anadromous fish, as Judge Carlton found and as the biological opinions also found. And so what did you – what was it? Did you want to stop the – have the dams torn down? What did you want? Well, our immediate aim is we wanted a valid biological opinion that would impose appropriate environmental conditions on those dams. Most important, fish passage past those dams. There's different ways of doing it. Removing the dams would be one, and it would be our preferred method. But there are alternative methods of getting fish passage past the dams, and the biological opinion that replaced this inadequate one had fish passage requirements in it, like trapping the fish and moving them around the dams. So that was an accomplishment in the new biological opinion. What else? And we also – the water diversion – one of the water diversions had an inadequate fish screen. The biological opinion found that. All versions of the various biological opinions that have been issued in this case that are pertinent to this case found that. We were hoping, however, to finally get an adequate fish screen for that water diversion, and that's why we also added YCWA, but it's also why we wanted a rewrite of the biological opinion to have those conditions be made more stringent. And the new biological opinion that replaced this biological opinion did those things. In addition, another of our key objectives is we wanted the Army Corps of Engineers, which owns and operates these two dams and licenses these water diversions, to implement the things that they could do in the short term. Granted, removal of dams, fish passage past the dams, those are long-term solutions, but there are things that they could do in the short term to make the situation significantly better for the endangered species, and District Court Judge Carlton ordered those things. That was a huge and significant win for us. And finally, we were hoping to make some good case law, not only in this situation, but because we are public interest advocacy groups that seek to advance the protection of anadromous fish generally. We were hopeful to make some good precedent, and we did. There were five published decisions between the three in FSUP and two in Westlaw. And the litigation extended over what period of time? Well, five years for the core substantive litigation, and then the fees litigation has basically taken up an additional year. Yes. Okay. And it produced an enormous record. I mean, this is not no one could look at this and say this is a simple cut and dried case. I mean, in Judge Carlton's published decisions over and over again, he referred to the novel and complex factual and legal issues raised. I mean, his decisions are precedential. They're cited by other courts. And we accomplished a great deal in an extremely complicated situation. At the close of the case, Judge Carlton complimented us. He complimented the defense lawyers as well, but he said this case has been well litigated. It has been well represented. And hard fought. And hard fought. And hard fought. And we have over 400 docket entries, voluminous record, and so on. I also wanted to respond in particular to the contention by my esteemed colleague that their FOIA claims is their strongest point. And if that's their strongest point, I find that very telling, because to my way of thinking and to Judge Carlton's way of thinking, that was one of the easiest things to reject out of hand. The motion for reconsideration essentially verbatim repeated arguments that they had made to the district court in their opening opposition to our fees request. And they time and time again, and even today in oral argument, they seem to be unable to grasp or at least to represent a candor to the court that there's a distinction between time we spent on our FOIA claims, which we settled, which we won a summary judgment motion and then settled, and time spent working with FOIA documents to develop our Endangered Species Act and Administrative Procedure Act claims. There is a line in the opening brief from the government where they acknowledge that, well, for the first time, you know, maybe there's a distinction between that time. But that distinction is paramount. We carefully, as carefully as we could, went through all of our time slips. And any time the word FOIA appears, which is what they did as well, we gave them searchable versions, we looked carefully at each of those entries. Now, is this an entry that deals with litigating our FOIA claims? Is this time spent drafting the motion for summary judgment on our FOIA claims that we won, legal research on FOIA law to bring that motion? That time came out. What was left was time spent drafting the FOIA claims and reviewing what we got back. Those were tasks that we undertook not to develop or litigate a FOIA claim, but to develop evidence that we used to show that there were Endangered Species Act violations and that there was an inadequate Administrative Procedure Act record. And we were successful. There were very important documents that we got through the Freedom of Information Act that we used and that are in the record. So if that's their strongest point, it's not a very strong case. Another point that I want to specifically respond to is the notion that we were largely a lost cause, that we lost 11 out of 15 motions. That's very creative accounting. That includes three motions that we lost, discovery motions that we lost before the magistrate, the discovery magistrate, that we took up on appeal to District Court Judge Carlton and got the magistrate reversed. Hart is in good faith he can't really call that a loss. Another example is the standing motion. Technically, Judge Carlton denied our standing motion, but at the same time, in the very order in which he denied our standing motion as a stand-alone motion asking for a ruling on a particular discrete issue, he said, I'm holding that the plaintiffs have standing in the context of our summary judgment motion, which was also on calendar at the same time. It's like having granted standing in one motion, I don't need to look at it raised additionally in a second motion. And as I said, it was prudent for us to bring that motion and to establish that point because, again, it's subject matter of jurisdiction. We could be standing here today and all three of you could say, well, where's your evidence of standing? Case dismissed. I also agree wholeheartedly with Your Honor's characterization that this case, being an abuse of discretion case, presents a very high hurdle for the government to seek reversal. And I want to underscore what the Federal Government represented to the district court was the appropriate methodology on how he should approach this, because it's at odds with what they're urging now. And I think what they urged the first time before the district court judge is the right methodology. And they said to the court on page 5 of their opposition to our motion for attorneys' record that the district court is in the best position to determine in the first instance the number of hours reasonably expended in furtherance of the successful aspects of a litigation, citing the Chalmers case. It may reduce an award of attorneys' fees if the award does not accurately reflect the time and labor required by the litigation cases cited. And here's a key passage. As the Ninth Circuit explained, there is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment, citing the Acquire case. When a court reduces an award by a particular amount, it need only provide a, quote, concise but clear explanation of how it arrived at that amount. This rule does not require an elaborately reasoned, calculated, or worded order, and only something more than a bald, unsupported amount is necessary, citing the Chalmers case. So it seems, with all credibility and candor, that the government could not stand here today and say that the very standard and approach that they articulated hasn't been met. Surely, Judge Carlson's 15-page decision reflects more than a bald, unsupported amount. And clearly, he not needing to provide this tribunal with an elaborately reasoned, calculated, or worded order, what he did write suffices. Okay. I think we understand your position on that. Were you conceding earlier that there's a $1,000 mathematical error in the computation? It appears that the Federal defendants are correct in that. If you multiply the total dollar amount awarded by 20 percent, it arrives at a figure that's exact to the penny but is $1,000 more. And it's to the government's benefit. It's to the government's benefit. And you haven't cross-appealed, so you're happy with your $1,000 less. Given it's small potatoes in the overall scheme of things. Okay. And I see I have two more minutes remaining. If you have no more questions, there maybe are a couple more points I would like to make. If the time is yours. Thank you very much, Your Honor. I did also want to emphasize that if you look at the government's methodology and what they articulated, and what they articulated is the appropriate methodology to the district court below, they were urging an opinion that looks very much like the opinion that was actually written with one difference. They wanted a 9 instead of a 2. If there had been a 9 in front of the 0 instead of a 2 in front of the 0, they would have said this is a paradigm example of what district court judges should do. But having lost by the very methodology that they suggested, they're now trying to suggest a different methodology that's not only at odds with the methodology they suggested below, but is at odds with the methodology that this court has repeatedly indicated, clear but concise. There is no obligation to do mathematical calculations. The across-the-board cut approach, it's not mathematical. It involves some exercise of judgment. He looked at all the objections raised by the federal government, and he either implicitly or explicitly rejected nearly all of them. There was a small subset of the objections raised by the federal government that he says, okay, these have merit. He looked at that small subset of matters that did have some merit, and he came up with a 20 percent across-the-board reduction as appropriate. He gave a sense of scale implicitly, if not explicitly, in that we had a whole slew of objections. Most of them are rejected. We have some that are accepted. This warrants a 20 percent across-the-board cut. A reversal here, I think, is only tenable if this Court is to effectively throw out the across-the-board cut methodology, which necessarily allows discretion in judgment. Thank you, counsel. Mr. Oakley, you have a little rebuttal time remaining. Three. Yes, you do. It's yours if you wish it. Well, I'd like to get a point. But more to the point. Let me first say we're entitled to a concise but clear explanation. We certainly got a concise explanation from the district court. It just was not clear enough. And, again, I would suggest you draw an analogy and look at the Gates v. Dumejian case. A couple of other points. There was a question on how much was involved in the standing issue. We have this on page 19 of our opening brief. It's $79,828 and change. Another quick point. Counsel bragged about establishing precedent in the district court decision. Did no such thing. District court decisions are not precedential. They're not even binding on the district court. So if the judge wants to rule, this very judge wants to rule another way in another case, he's free to do so. No precedent there. I ---- It's citable. It's citable, sure. But it's not going to bind any other district court or a certain district court or anybody else. The ---- we didn't get the concise but clear explanation. And one last point. Billing judgment. Counsel is supposed to exercise billing judgment in submitting fee requests. And billing judgment means looking at what your total hours are but saying, as people do in law firms, you know, this is just too many hours. I'm not saying anybody did anything wrong, but it took too many hours to do this, so we're going to reduce our own fee demand. The only billing judgment exercised by the counsel, which is argued in front of you, was to not ask for money he'd gotten already in the FOIA request. He says, my billing judgment is I'm not going to seek recovery of the fees that we recovered in the FOIA settlement. So he's not going to commit fraud. And I'm not going to seek money that's been paid to me by a third party that was involved in litigation with whom we settled, which that wouldn't be attributable to the government. Not committing fraud is not billing judgment. Billing judgment is exercising some effort to evaluate it, the hours billed, and to make the appropriate reductions. And that duty was just completely ignored by counsel. So we didn't get the concise but clear explanation, and in the six pages of analysis here, and I would just submit that given the size of the case, the record, I just don't see how 5,800 hours could be billed to this case. Evidently, they were. But I'd ask that you reverse the Court, and at the very least ask the district court to explain those things which you didn't explain below and to reconsider this case. Thank you. Thank you, counsel. The case just argued is submitted. We appreciate the arguments from both counsel.
judges: SCHROEDER, GRABER, BYBEE